15 So.2d 594

## GABLE et al. v. STATE.

### 1 Div. 442.

Court of Appeals of Alabama.

June 15, 1943.

Rehearing Denied Oct. 5, 1943.

---

[1] 244 Ala. 413.

Beddow, Ray & Jones, of Birmingham, and Hybart & Chason, of Bay Minette, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

**BRICKEN, Presiding Judge.**

From a judgment of conviction for the offense of robbery, this appeal was taken.

The robbery, complained of in the indictment, was to the effect that the two above named appellants, together with one Glen Townes, and William Pritchett, feloniously took $1711 (properly described), the property of Reuben Augustus Eades, from his person, and against his will, by violence to his person, or by putting him in such fear as unwillingly to part with the same, etc.

The indictment was proper in form and substance, and no objection by demurrer or otherwise was interposed.

The defendant, William Pritchett, demanded, and was granted, a severance. The three remaining defendants, in answer to the indictment, plead not guilty. The trial in the court below resulted in the conviction of Gable and Hutter, who were each sentenced to a term of imprisonment in the penitentiary of ten years. Defendant, Townes, upon said trial, was acquitted by the verdict of the jury, on the question of mistaken identity.

The evidence for the State made out the case in its every detail as charged. Eades, the alleged injured party, testified, among other things, that on June 12, 1941, at about one o'clock (day) he left Fairhope, his home, in a car accompanied by a young woman, Miss Patricia McFall, to go to Mobile, some miles distant. "After thus travelling for about a mile from the limits of Fairhope, someone pulled up to the side of me. When the car pulled up side of me, the first I noticed was I heard somebody say something, and I looked to the side and saw these three men with two of them out the window with guns. The car came up from behind like it was going to pass me. I heard the car and then I heard them say something. I heard them speak. That was the first thing that drew my attention. When I looked around I saw Gable hanging out the front window of the car with a pistol in his hand and Townes out the back window. I did not know either of these three defendants at the time. I did not know their names. I have since learned their names in connection with the preliminary hearing and seeing them. All three of these men were in that car at the time. Hutter was driving the car which was a Ford, 1941 Ford, two-door sedan. I say Mr. Hutter, the defendant there, was driving the car. Mr. Gable, the man back behind there, was sitting on the front seat by Mr. Hutter. Mr. Townes was on the back seat. No one besides those three men were in the car. They were telling me to stop and I did stop. When I stopped the car two of them, Gable and Townes, got out and came to my car. The two cars were stopped together and they immediately jumped out of their car and came to my car, and Townes got in the front seat of my car and Gable at the same time come over and they told me to 'lay your head in the girl's lap.' They had weapons with them when they got out of the car. The defendant Gable had a nickel plated pistol. Mr. Townes, the nearest one to me, had a blue or black looking gun—a blue or black dark gun. When they came over to me they had those guns out. The first thing said was Gable told me to lay my head in the girl's lap. After he said that Townes got in the front seat and Gable got in the back seat. Gable first ordered me to lay my head in the girl's lap. The car had four doors and the girl was sitting to my right, and Gable was the one that told me to put my head in her lap. I obeyed the order. They both got in the car practically at the same time and Townes drove the car off. Townes got in the car side of me and Gable on the back seat. At first immediately after they got in the car Gable reached over the seat and reached in my pocket and said, 'We are going to take your money.' And so he took the money out of my pocket. Mr. Gable reached from the back seat over and got my money and Townes was sitting in the car at that time. The car was standing still. I saw Mr. Gable with that pistol at that time. He had the one I called the shiny pistol drawn on me at that time. I did not part with the money willingly but I had to. I did not consent to him taking the money. $1711.00 was taken from me. The whole $1711.00 was in currency. He reached over the seat to get to me and he had his pistol drawn at that time. When they took the money Townes asked Gable, 'Are we going to take them somewhere or leave them here?' and he said, 'We will take them somewhere.' He started the car and drove the car down the road something like a mile

or maybe a little further, I don't know exactly how far, and they first started to pull off the road to the right and so he drove the car off the road, and Gable on the back seat said to him: 'Don't go up there, there's a house up there.' And he backs the car out on the highway and goes down the road about 150 feet and turned to the left. The road he turned off on was just a side road and it went towards the bay. We went down that road, I imagine, something over a quarter of a mile. When we got down there, Gable asked me if I had another key to the car with me and I said, 'No, I have another one at home,' and he said, 'Well, do you have a pistol,' or I believe he said, 'Do you have a gun?' and I said no, and he said, 'Do you have a watch?' And I said yes, and he said, 'What time is it?' and I said '17 minutes after one,' and he said, 'Stay here for twenty minutes and you can leave and you will find your keys on the highway.' And so he took the key from out of the car and they left and evidently went back to the highway. They left walking; I might say trotting. They left hurriedly on foot. I couldn't see the other car. I think I heard the car when it started off on the highway but I couldn't see it. I had my head down inside the car. They told me to remain there twenty minutes and I stayed there twenty minutes. From there, I went back to Fairhope. I made a report of what happened immediately when I got back to Fairhope. I next saw these three defendants in Montgomery on Monday morning after the Thursday afternoon my money was taken. They were in jail at Montgomery. I observed all three of them there at that time. These are the three men that were present there, Glenn Townes, Charlie Hutter and Fred Gable, when they took my money. It happened in Baldwin County, Alabama, that place where I parted with my money. I identified these men there in Montgomery in the jail. I identified the three when I went to Montgomery after they were apprehended, and that was on Monday after this happened on Thursday."

The only other eyewitness to the alleged robbery who testified for the State was the above mentioned young woman, Miss McFall. Her testimony as to the robbery was practically identical with the above narrated testimony of Eades, the alleged injured party.

The foregoing testimony as to the actual robbery was without dispute or conflict.

The defendant's contention was, and is, that the alleged robbery was committed by and with the consent of Eades, who had prearranged with defendants that a fake holdup be had. Appellant Hutter, being the only eyewitness for defendants, testified in detail as to this. Among other things, defendant Hutter testified: "I was present in Baldwin County, Alabama, on the 12th day of June 1941, when some money was taken off Mr. Eades; that was $1520.00. There was not five one hundred dollar bills in it; there were four one hundred dollar bills in there. * * * I had one of those one hundred dollar bills when I was arrested. I don't know whether or not Mr. Gable had one of those one hundred bills in his possession at the time. I know I had one of the one hundred dollar bills that come off Mr. Eades' person. Mr. Gable and I had already divided up the money, we split even. I got $760.00 out of the deal. I don't remember now whether or not I got more than one of those one hundred dollar bills. It was all in currency. * * * I was in the car at the time the money was taken off Mr. Eades, and Mr. Gable was on the back seat. We all had guns. Mr. Gable had the nickel plated shiny gun."

█ From the foregoing respective insistences it is clearly apparent that the controlling and conclusive question in this case is one of fact for the jury to determine. As stated, the evidence for the State, if believed under the required rule, as to measure of proof, makes out the case in its every detail, and shows a clear and aggravated case of robbery.

█ If the contention of the defendants is the correct one, there could be no conviction of the offense of robbery, for in order to constitute that offense there must be not only a felonious taking of the property alleged, but such taking must be against the will of the person robbed, or by violence to his person, or putting him in such fear as unwillingly to part with the same.

Upon the trial in the court below, and here on appeal, these two defendants are represented by two of the ablest and most prominent firms of Attorneys in this State. Both firms have filed copious and elaborate briefs on appeal wherein it is insisted that upon the trial of this case, in the court below, numerous rulings of the trial judge constituted reversible error. These insist-

ences are grouped under several distinct heads.

The first proposition presented relates to the following occurrence as shown by the record, viz.:

"The State closed. The defendant closed. The solicitor for the State, while arguing the case to the jury made the following statement: 'Now, gentlemen of the jury, wouldn't it be unusual for Eades to have a stranger to come to Baldwin County and rob him; that's what Hutter says. All you have to consider as to the framed robbery is the testimony of Mr. Eades against that of Mr. Hutter—Gable didn't take the stand and I can't comment on that.'

"Whereupon the following proceedings were had:

"Counsel for Defendant: 'Now, we object to that statement. He said Gable didn't take the stand, and we want to object to the gentleman making that statement to the jury.'

"Solicitor for the State: 'I said I couldn't comment on it.'

"Counsel for Defendants: 'We object on the ground he is calling it to the attention of the jury without authorization of law, and we ask the court in no unmistakable terms to admonish the jury he didn't have to take the stand. If the other witness, the other defendant took the stand and testified and went through all of it we didn't have to go through the whole thing again.'

"By the Court: 'Yes, gentlemen, a defendant has the option as to whether or not he will take the stand in the trial and no adverse presumption arises as a matter of law because of his failure to take the stand; and it is not proper subject of comment by counsel either for the State or the defendant.' "

It will be noted that the trial court ruled with the defendant as above quoted. No other ruling in this connection was invoked, but on the motion for a new trial this matter was made the basis of the 16th ground of said motion. This particular ground of the motion for a new trial, as stated therein, is not in strict accord with the above quoted occurrence as shown by the bill of exceptions. On this insistence, or proposition, we are not prepared to put the court to error, or to declare that the cursory, though ill-advised, remark complained of, supra, is within the inhibition of the Statute. The statement complained of appears to have been a mere passing remark of what was already known to the jury, and no further or other comment was made or indulged. The rule governing insistences of this character is clearly stated by our Supreme Court in the case of Stone v. State, 105 Ala. 60, 72, 17 So. 114, 118, where the court said: "The statute forbids comment in argument of a criminal cause upon the failure of the defendant to testify. Code, § 4473. We construe both the remarks shown by the bill of exceptions to have been made by the solicitor to be within the inhibition of the statute. But we cannot revise judgments here on account of the sayings and doings of counsel. We review only the action of nisi prius courts. To bring questions growing out of improper arguments of counsel under revision, the trial court must first be appealed to, to remedy the wrong by eradicating any effect the argument may have had from the minds of the jury, through appropriate instructions given them at the time, and otherwise. If the court fails to act upon such appeal being made to it, or acts erroneously, an exception reserved to the act or omission of the court, *and that alone*, will bring the question before us. In this case the exception reserved was to what the solicitor said, and not to what the court did or failed to do."

In numerous other cases the Alabama Courts have held that when the trial court gives the jury proper instructions after a remark that the defendant did not take the witness stand the same is without injury. In Kilpatrick v. State, 213 Ala. 358, 104 So. 656, 661, after the counsel for prosecution had referred to the fact that defendant had failed to testify in his own behalf, the court said: "But the court told the jury that the argument was improper, and that they should not allow it to have any weight whatever in their consideration of the case. We are unable to say that the error of counsel in this case was remediless, or that the court failed to adopt a timely and sufficient corrective, and hold therefore, that the remark of counsel affords no just ground of reversal." See also Watkins v. State, 21 Ala.App. 585, 111 So. 43, 44, where this Court said: "The solicitor should not have commented upon the fact that defendant did not testify. The court so ruled and emphatically impressed the jury not to consider the statement. We think the court eliminated any injury resulting from the solicitor's remark."

In the case at bar the objection of the defendant's counsel was properly sustained and the jury was told that no adverse presumption should arise. Thus the error of the solicitor, if error prevailed, was obviated. Lucas v. State, 24 Ala.App. 468, 137 So. 902, certiorari denied 223 Ala. 677, 137 So. 903; Curlette v. State, 25 Ala. App. 179, 142 So. 775.

The next insistence of error is predicated upon the following as shown by the record:

"After the jury was given the case on December 3, 1941, the jury was returned to the court room at about two o'clock P. M., on the afternoon of December 4, whereupon the following proceedings were had:

"By the Court: Gentlemen, is there any question of law that is bothering the jury in any way? If so, I would be glad to assist you in any way I can.

"Juror: Your Honor, Judge, would it be all right for us to go ahead and reach a verdict on two, and then on one if we couldn't reach a verdict could we call a mistrial on that?

"The Court: You could; yes, sir.

"Juror: On the other hand, if we reach a verdict on one could we call a mistrial on the other two?

"The Court: Yes, sir. Anything else?

"Juror: No, sir.

"The Court: All right, you may retire.

"Counsel for Defendants: Judge, I want to note an exception to the instructions of the Court to the jury in the absence of the defendants.

"The Court: Correct you are. Let that jury come back. Let the defendants be brought into court. I had them before dinner, and didn't notice they were not present. Tell that jury to come back.

"Whereupon the jury was brought back into the court room and the defendants were brought from the County Jail where they were being held in custody, into the court room. Thereupon the following proceedings were had—the jury and the defendants at this time being present:

"The Court: Gentlemen, of the jury, one of the attorneys for the defendants has called my attention to the fact that the defendants were not present in court at the time the juror asked two questions a while ago. I sent for you this morning and also sent for the defendants, and it also escaped my attention that they were not present at the time the questions were asked the Court and the answers made by the Court touching the legal questions inquired about, and, as stated that was improper for those questions to be asked in the absence of the defendant, and in order that there may be actually no damage done, I will ask the Juror to repeat those two questions in the words as near as possible as you asked the court a while ago.

"Juror: Does he have a record of it.

"The Court: Yes. I will ask the Reporter to read the questions. Pursuant to the request of the Court, the Court Reporter read the question propounded by a member of the jury and the instructions of the Court made in response thereto as follows: 'Your Honor, Judge, would it be all right for us to go ahead and reach a verdict on two, and then on one if we couldn't reach a verdict could we call a mistrial on that?'

"The Court: Is that your question?

"Juror: Yes, sir.

"The Court: You could. The answer of the Court to that is that you could. Now read the question, Mr. Reporter.

"Reporter reads: On the other hand, if we reach a verdict on one, could we call a mistrial on the other two?

"The Court: That your question?

"Juror: Yes, sir.

"The Court: The answer to that is, you could. Is there any other information I could give you?

"Juror: There is another question we want to ask. Was those guns loaded or was they empty when they were arrested in Montgomery.

"The Court: You will have to consult your own recollection as to the evidence in the case. The Court couldn't give you any information at all as to that. You will have to rely on your own recollection as to that.

"The defendants instituted an exception to the Court's instructions to the jury."

As to the foregoing we are unable to see and to hold that prejudicial error to the substantial rights of the defendants inured. The trial court, when attention was called, by defendant's counsel, to the fact that the defendants were not in court, did what he should have done, by having defendants brought into court, and in their presence and hearing went over again the entire matter complained of, and

286

repeated in their presence, verbatim, what had occurred when their absence was unknown to the trial court. Manifestly, when the court and jury were first consulting, defendant's counsel were aware of the absence of defendants from the court room, though the trial court was not. It was therefore encumbent upon counsel to have informed the court as to this, and not sit quietly by, and then reserve an exception to the court's unintentional action. There is no merit in the exception reserved under the facts and circumstances hereinabove detailed. Ferguson v. State, 24 Ala. App. 491, 137 So. 315, certiorari denied 223 Ala. 521, 137 So. 317.

■ Under appellants' third proposition it is contended that error prevailed in the action of the court by allowing the State to offer proof by several witnesses of the general good character, and good character for truth and veracity of Eades, the alleged injured party; the insistence is, that no effort to impeach the testimony of State witness Eades had been made, and that mere contradiction of his testimony by one of the defendants would not justify such ruling. The law, as to this is elementary, and should not require or necessitate the prolonged and elaborate argument in briefs by earnest counsel. The record, however, does not bear out this insistence, as it appears conclusively that in the cross-examination of witness, Eades, the defense sought to impeach the witness by introducing evidence of contradictory statements made by him when testifying at the preliminary trial of this case. The cross-examining counsel for defendants laid predicates to witness Eades as to what he testified to at the preliminary trial, and afterwards introduced the testimony taken at that time to impeach him. Hence, as stated, there was no infringement of the rule, and no error of the court appears as to this. Dickson v. Dinsmore, 219 Ala. 353, 122 So. 437, 438. In said case the Supreme Court said: "It has long been established in Alabama that one method of impeaching a witness is, after a proper predicate to the witness, to prove that he made a statement contradictory of that given in evidence, and that when there is such nature of impeaching · evidence, the party offering the witness has the privilege of supporting his veracity by proof of the general good character of the witness." See also Tilley v. State, 167 Ala. 107, 52 So. 732; Alexander v. Alexander, 214 Ala. 291, 107 So. 835.

■ Several grounds of the motion for a new trial are based upon the action of the trial court in refusing to defendant numerous purported written charges. These charges as appear in the record and also in the motion for a new trial are no part of the record, and cannot be considered on this appeal, for the reason they bear no endorsement of the trial judge as the Statute requires. Section 273 of Title 7, Code 1940, provides (pertinent here): "Charges moved for by either party must be in writing, and must be given or refused in the terms in which they are written; and it is the duty of the judge to write 'given' or 'refused,' as the case may be, on the document, and sign his name thereto; which thereby becomes a part of the record." (Emphasis ours.) As will be noted, this section requires the endorsement of the trial judge to make the given or refused charges a part of the record. The fact that the clerk inserts the charges in the record does not make them a part of the record, unless they bear the endorsement of the trial judge as having been given or refused. Berry v. State, 231 Ala. 437, 165 So. 97, and cases cited.

Upon examination of the record we find no facts to sustain the 10th ground of the motion for a new trial.

There are numerous other insistences of error in this case. It is impractical and unnecessary to deal specifically in this opinion with each and every one of them, hence we refrain from so doing. We have, however, carefully examined into, and have given attentive consideration to every exception, and to all points of decision which are here presented, and in none of them do we find any error of a reversible nature. This statement is incorporated here for the purpose (if they so desire), and review by certiorari is had, the appellants may not be precluded from presenting to the Supreme Court, again, the action of the trial court in every instance where exception was reserved to the rulings complained of. This case is unusual in that there is no denial that the act complained of was in fact committed by these two parties, at the time and place designated. Therefore, as stated hereinabove, the controlling and conclusive question was one of fact for the jury to determine. The trial judge was fair in every respect; this is clearly apparent, and, as stated, we have discovered no ruling of the court the tendency of which could or did militate against or prevent the jury in its deliberations on this

crucial point, this sole question of fact, from deciding the case as the law provides, requires and demands. As we see and understand this case if any technical error occurred upon the trial, although we have discovered none, the provisions of Supreme Court Rule 45, Code 1940, Tit. 7 Appendix, should be applied. The rule provides: "Hereafter no judgment may be reversed or set aside, nor new trial granted by this court or by any other court of this state, in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken, or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."

The judgments of conviction from which these appeals were taken are affirmed.

Affirmed.